# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| MARY SOBERY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:07CV0897 AGF |
| | ) | |
| MICHAEL ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This action is before this Court[1] for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Mary Sobery was not disabled and, thus, not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34. For the reasons set forth below, the decision of the Commissioner shall be affirmed.

Plaintiff, who was born on June 28, 1946, filed for disability benefits on May 26, 2005, at the age of 58, claiming a disability onset date of June 1, 2003, due to obesity, knee and back pain, high blood pressure, and arthritis. (Tr. 58-60, 67.) After her application was denied at the initial administrative level, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") and such a hearing was held on September 19, 2006. By decision dated October 25, 2006, the ALJ found that Plaintiff could return

---

[1]     The parties have consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

to her former work as a teacher, teacher's aide, cashier, or retail salesperson, and was thus not disabled. Plaintiff's request for review of the ALJ's decision by the Appeals Council of the Social Security Administration was denied on April 25, 2007. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ erred in finding that she was able to do her past work, and that he should rather have applied the Commissioner's Medical-Vocational Guidelines ("Guidelines"), 20 C.F.R. § 404, Subpt. P, App. 2, which, according to Plaintiff, would have resulted in a finding of disability. Specifically, Plaintiff argues that the ALJ committed reversible error by (1) not making specific findings as to the physical and mental demands of Plaintiff's past work; (2) not considering the impact of Plaintiff's obesity on her ability to work; (3) ignoring a third-party statement in the record regarding Plaintiff's limitations; (4) relying on the unsigned report of a consulting physician (A. Tayob, M.D.); and (5) relying on the opinion of a non-examining physician (presumably also Dr. Tayob) regarding impairment severity, in that such opinion was not based on a review of the entire record. Plaintiff requests that the decision of the Commissioner be reversed and that the case be remanded for a new hearing.

**Work History and Application Forms**

Plaintiff's work history, as reported by Plaintiff on forms accompanying her application for benefits, dates back to 1986. From 1986 to December 2001, Plaintiff worked as a long-term substitute teacher at various St. Louis Archdiocese grade schools.

During this period, from 1989 to 1991, Plaintiff also worked as a retail clerk/salesperson/cashier at a ladies' clothing store. In 1995, she began teaching religion in parish schools within the St. Louis Archdiocese. Plaintiff continued to teach these religion classes through 2005. Plaintiff also indicated that from 1996 to 1999, she was a day-care teacher, first on a substitute basis and then full-time. In the 1997-1998 academic year, Plaintiff was a teacher's aide in a St. Louis Archdiocese parish grade school. From January 2002 through August 2003, Plaintiff was a full-time teacher. In the 2003-2004 academic year, Plaintiff taught fourth grade half-time at a Catholic grade school, finishing in June 2004 (when the school closed). (Tr. at 65, 94.) Earnings records show that Plaintiff's annual earnings were under $9,000 in most years since 1986. In each of 1991, 1994, and 1995, Plaintiff earned less than $1,000. The highest salaries earned by Plaintiff were in 1997, when she earned $10,677, and in 2002 and 2003, when she earned approximately $14,000 per year. In 2004, Plaintiff earned approximately $6,500 through June. Id. at 55.

On forms related to her application for disability benefits Plaintiff indicated that she was taking Hyzaar for high blood pressure, and nabumetone (generic Relafen, an anti-inflammatory drug) and aspirin for arthritis pain. Id. at 64.

**Medical Record**

Medical records date back to 1993 and show that between October 1993 and March 1998, Plaintiff's weight rose from 276.5 pounds to 300 pounds and her blood

pressure ranged from 160/100 to 140/70. Medical notes of Reynal L. Caldwell, D.O.,

report that Plaintiff, who was 5' 7", suffered from hypertension and arthritis, for which

Dr. Caldwell prescribed Cozaar (an anti-hypertensive) and Cataflam (a drug used to treat

osteoarthritis and also indicated for associated pain relief), and on four occasions gave

Plaintiff 1 cc injections of "Dex Ace" (presumably Dexamethasone, an anti-inflammatory

steroid used to treat arthritis). Id. at 163-67.

　　　Upon referral by Dr. Caldwell, Plaintiff visited Gary W. Farley, D.O., an

orthopedist, on April 22, 1998, for pain in both of her knees, worse in her right knee

which had been injured approximately 15 years earlier when Plaintiff fell on the ice.

Plaintiff indicated that she had "severe arthritis pain" when in certain positions, and pain

in "step walking." She also reported difficulty with ambulation. Dr. Farley noted that a

review of Plaintiff's x-rays showed significant degenerative changes of the right knee,

with well-maintained joint in the left knee. He discussed six treatment options with

Plaintiff: (1) increasing the dosage of Cataflam, (2) changing to a different medication,

(3) steroid injections, (4) a series of Synvisc injections (a treatment of osteoarthritic knee

pain in patients who do not respond to common pain medications), (5) arthroscopy, or (6)

total knee replacement. Plaintiff elected to try a higher dosage of Cataflam and, if that

did not work, to return in a few weeks to change medications and have a steroid injection.

Id. at 132-33.

　　　On May 6, 1998, Plaintiff returned to Dr. Farley and reported that the increased

dosage of Cataflam had not given her significant relief. Dr. Farley gave Plaintiff a steroid

injection in her right knee and samples of Daypro (an anti-inflammatory), and also prescribed Ultram (a pain-management medication). Plaintiff returned two weeks later and told Dr. Farley that the injection "was still helping her," that the Daypro gave her "some relief," and that she took Ultram on an as-needed basis. Id. at 134.

Plaintiff next saw Dr. Farley on December 16, 1998, complaining of pain in both of her knees. Dr. Farley, who had refilled Plaintiff's Ultram and Daypro prescriptions between her visits, noted that Plaintiff had been on Ultram "for quite a period of time" and that at times she also took Tylenol. He prescribed Medrol (an anti-inflammatory drug) and Relafen, and increased the dosage of Ultram. Id. at 135.

From 1998 to 2003, Plaintiff visited Dr. Caldwell's office on at least nine occasions. Over the course of these visits, Plaintiff's weight steadily increased to 330 pounds in July 2003, and her blood pressure fluctuated between 120/80 and 150/90. Drs. Caldwell and/or Farley consistently diagnosed hypertension and arthritis, and prescribed and refilled Plaintiff's prescriptions of Hyzaar and Relafen. Id. at 136, 156-62. Additionally, between 1998 and February 16, 2004, Plaintiff received steroid injections six times. Id. at 156-62.

On June 9, 2004, Plaintiff was seen by B.F. Mallard, M.D., at Dr. Caldwell's office. Plaintiff requested refills on her blood pressure medications and a steroid shot for her arthritis in anticipation of a trip "that will require a lot of walking." Dr. Mallard noted that Plaintiff's hypertension was stable with medication, and advised her to continue her current regimen of Hyzaar and Relafen for her degenerative joint disease

("DJD"). He also indicated that Plaintiff should return during the next week for an injection closer to the date of her trip. On June 14, 2004, Plaintiff returned to Dr. Mallard, who gave her a 1 cc injection of Dexamethasone. Id. at 155. Dr. Caldwell gave Plaintiff another Dexamethasone injection on August 17, 2004. Id. at 154.

On April 1, 2005, Plaintiff again visited Dr. Caldwell for refills of her prescriptions. At this visit, Plaintiff weighed 342 pounds and her blood pressure was 130/80. Dr. Caldwell diagnosed hypertension, and continued Plaintiff's prescriptions for Hyzaar and Relafen. Id. at 154. On April 25, 2005, Plaintiff received another 1 cc Dexamethasone injection. Id. at 153. On June 1, 2005, Plaintiff visited Dr. Caldwell, "to discuss disability." At the time, Plaintiff weighed 338 pounds and her blood pressure was 130/80. Dr. Caldwell diagnosed arthritis and gave Plaintiff a referral (the record is unclear regarding to whom and for what). Id. at 153. Thereafter, on June 3, 2005, Dr. Caldwell wrote a letter "To Whom Concerned," indicating that it was medically necessary for Plaintiff to continue on Hyzaar 100/25 daily and Relafin 500 mg twice a day. Id. at 118.

On July 7, 2005, Loreta Mendoza, M.D., examined Plaintiff in connection with Plaintiff's application for disability benefits. Dr. Mendoza reported that Plaintiff was 59 years old, was living with her husband in a three-bedroom ranch house with laundry facilities in the basement, and was working part-time as a teacher and teaching additional evening sessions. Dr. Mendoza recorded that Plaintiff's chief complaints were obesity, knee and back pain, high blood pressure, and arthritis. Regarding her obesity, Plaintiff

indicated to Dr. Mendoza that she had been overweight since she was 35 years old, and had been maintaining her current weight of approximately 300 pounds for the past two to three years. Id. at 173.

Plaintiff told Dr. Mendoza that her right knee was more painful than her left knee, that both had been bothering her for a long time, that over the past five years the pain had started to affect her activities, and that cold and damp weather aggravated the pain. Plaintiff indicated that it was hard for her to go up and down steps. When she went down steps she sometimes went backwards; when going up steps she used the banister to pull herself up one step at a time or used a cane for balance. Plaintiff told Dr. Mendoza that over the past three to four years she had had to use the sit-down cart in the grocery store. Id. at 173.

Plaintiff indicated that often after walking for about 15 minutes she felt pain in her knees. In good weather, without medication, the intensity of pain was an eight on a ten-point scale; with Relafen, the pain was a five; in cold or damp weather, her unmedicated pain was a ten, and her medicated pain was an eight. Id. at 174.

Regarding her back, Plaintiff indicated that she experienced discomfort across her lower back after standing for about 15 minutes. She would typically then sit to rest for about ten minutes before getting up again. Plaintiff reported that it was very hard for her to sit on low chairs or commodes, and that when she did so she typically had to push herself back up. She also told Dr. Mendoza that in order to complete her last year of teaching (2003-2004), she had to have intramuscular steroid shots every four weeks.

Plaintiff reported that these shots "somehow gave a magical relief for about a week," and that she had asked her doctors for the same treatment before going on a trip.  Id. at 174.

Plaintiff indicated to Dr. Mendoza that she had a history of high blood pressure for approximately the past four years, and that she took Hyzaar to control it.  Plaintiff indicated that she did not have any history of heart attack or stroke.  Id. at 174.

Dr. Mendoza noted, upon examination, that Plaintiff weighed 343 pounds, stood 65 inches (5' 5") tall, had blood pressure of 166/88, was "neat in her personal appearance," and was "not in any acute physical distress."  Dr. Mendoza observed that it was hard for Plaintiff to get on and off of the exam table, but that she could stand up agilely from a sitting position.  According to Dr. Mendoza, Plaintiff said that her pain on the day of the exam was better than it typically was during the winter, which she attributed to the good weather on the day of the exam.  Id. at 174.

Dr. Mendoza also noted that Plaintiff had "some" scoliosis in the back.  On the day of the exam, Plaintiff did not have any lower back discomfort, but Plaintiff did indicate that when the discomfort existed it was across L-3 and 4.  Id. at 174.

Dr. Mendoza found no tenderness on palpitation of Plaintiff's knees.  Plaintiff's right knee had "mild swelling on the anterolateral surface of the right patella," while there was no swelling in the left knee.  Dr. Mendoza found no instability in either knee, a positive McMurray's[2] on the right, and flexions of 120 degrees with some discomfort on

_____

[2]     A McMurray Test tests for injuries to the meniscal structures of the knee.  A
(continued...)

the right and 130-135 degrees on the left with no discomfort. Dr. Mendoza noted that

Plaintiff could not reach the full 150 degrees on the left "just because of the weight."

Plaintiff also exhibited "full flexion of both hips at about 80 [degrees] and that's because

of the weight and full abduction with no discomfort." Id. at 175-76.

Dr. Mendoza noted that Plaintiff had a walking cane with her, but she did not

"really need it to walk. She said she does use it in bad weather when her right knee is

really hurting so that she can take the weight off the right knee." Dr. Mendoza continued,

recording that: "Today, she's walking without the cane . . . ." Dr. Mendoza also reported

that Plaintiff could stand on her toes and heels, but that it was hard for her to take steps

while doing so because of her weight. Plaintiff could squat approximately one-third of

the way to the ground, but only while holding onto something; had no problems with

dexterity or finger control; had no muscle atrophy; and could bend over when she needed

to pick items up off the floor. Id. at 176.

In the neurological section of her examination report, Dr. Mendoza indicated that

Plaintiff sometimes drove herself to the grocery, had good motor strength and pinprick

sensation in all four extremities, and had equal deep tendon reflexes. Dr. Mendoza also

noted that "[a]s far as straight leg raising,[3] questionably positive on the left side at 30

---

[2](...continued)
positive McMurray's indicates injury. Stedman's Medical Dictionary 1956 (28th ed. 2006).

[3]     A test to determine whether a patient with low back pain has an underlying
(continued...)

degrees.  [Plaintiff] has good strength in dorsiflexing and plantar extending in both big toes against resistance."  Dr. Mendoza diagnosed: "1.  Overweight.  2. Mild hypertension. 3.  . . . DJD of the knees, right worse than the left and some mechanical low back discomfort."  Id. at 176.

Dr. Mendoza completed a Range of Motion Chart, indicating that Plaintiff's range of motion in her shoulders, elbows, wrists, hips, ankles, and spine were all normal; that Plaintiff could fully extend her hands, make fists, and cross her fingers; and that Plaintiff had good upper extremity strength, normal grip strength, and normal lower extremity strength.  Dr. Mendoza recorded that Plaintiff's flexion-extension was 120 degrees in her right knee and 125 to 135 degrees in her left.  Dr. Mendoza annotated on the Chart that the limitation in the left knee was "because of weight."  Id. at 177-78.

On July 28, 2005, non-examining consultant A. Tayob, M.D., completed a Physical Residual Functional Capacity ("RFC") Assessment of Plaintiff.  Dr. Tayob did not sign this report, rather his name ("A. Tayob"), "Medical Consultant," and the date are printed on the final page.  Dr. Tayob indicated in check-box format that Plaintiff had the following exertional abilities: she could occasionally lift and/or carry 20 pounds; frequently lift and/or carry ten pounds; could stand and/or walk about six hours in an eight-hour work day; could sit (with normal breaks) for about six hours in an eight-hour workday; could occasionally climb ramps or stairs, balance, stoop, kneel, crouch or

_____

[3](...continued)
herniated disk.  Sciatic pain before 70 degrees is considered a positive result.

crawl; and could never climb ladders, ropes or scaffolds due to her obesity. He noted in narrative form that Plaintiff's hypertension was stable; that Plaintiff exhibited some scoliosis and mild swelling in the right knee, and used a walking cane, but did not really need it; and that in June 2004, Plaintiff retired and went on a trip that entailed a lot of walking. Dr. Tayob opined that Plaintiff's alleged difficulty in walking, which she noted as a debilitating limitation, was not substantiated by the medical record. He further opined that Plaintiff had no limitations with respect to her ability to push and/or pull objects; and no manipulative, visual, communicative, or environmental limitations. In summation, Dr. Tayob wrote that Plaintiff "is obese . . . [t]he limitations she alleges as of AOD [alleged onset date] are partially credible." Id. at 73-80.

On August 26, 2005, Plaintiff returned to Dr. Caldwell, complaining of mild dizziness when changing positions. At this visit, Plaintiff weighed 340 pounds and her blood pressure was 130/78. Dr. Caldwell requested lab work, gave Plaintiff a 1 cc shot of Dexamethasone, and prescribed a cane for support. On August 30, 2005, Plaintiff received another 1 cc Dexamethasone shot from Dr. Caldwell. Id. at 153.

On July 24, 2006, Ronald Levy, D.O., examined x-rays of Plaintiff's knees and spine. He noted eburnation[4] along the weight-bearing aspects of both knees, and joint space narrowing in the medial compartment of the left knee with spurring at the margins. Dr. Levy noted that he did not observe any fracture or bony destruction, and he diagnosed

---

[4] Eburnation is a change in bones, associated with DJD, in which exposed bone is converted into a dense substance with a smooth surface like ivory. Stedman's 606.

mild degenerative changes in the left knee and marked degenerative changes in the right knee.  He reported that the x-ray of Plaintiff's lumbar spine showed that vertebral bodies and pedicles were intact; anterior lipping was present throughout the lumbar spine; scoliosis was affecting the lumbar spine with convexity to the patient's right and the apex of the curve at the L2-3 level; and there were mild degenerative changes affecting the articular joints.  Dr. Levy diagnosed spondylotic changes, degenerative disc disease, and scoliosis.  Id. at 122-24.

**Evidentiary Hearing of September 19, 2006**

Plaintiff, represented by counsel, testified that she was 60 years old and a college graduate.  The ALJ asked Plaintiff what jobs she had held in the past 15 years besides being a substitute teacher, and Plaintiff responded that she had also been a full-time teacher.  She added that some of the substitute positions had been on a long-term basis for between 6 to 8 weeks and nearly a full academic year.  Plaintiff had also taught, and at the time of the hearing. continued to teach, religion classes two evenings a week, once for one hour and once for an hour and a half, for which she was compensated $20 a night. (Tr. 197-98.)

Plaintiff stated that she had worked full-time at a private school until June 2003, when the school closed, and never worked full-time again.  She stated that from August 2003 until June 2004, she worked part-time at another school.  Id. at 198-202.

Plaintiff testified that she was 5' 6" tall, and that she weighed 330 pounds.  She had weighed 250 and 280 pounds in the past, but as her activity had become more and

more restricted her weight gradually increased. Plaintiff stated that approximately ten years earlier she had exercised on a daily basis, walking a mile every night, but that she had to stop because of arthritis in her feet. She testified that her husband retired in May 2005 due to an episode with his heart. Id. at 203-04.

Plaintiff testified that the problem that currently kept her from working was arthritis. She elaborated that she had severe arthritis in her knees, lower back, right shoulder, hands, and more recently, in her hips. Plaintiff testified that the arthritis in her knees prevented her from climbing stairs repeatedly, though she could do so occasionally. She went up the stairs to church the previous Sunday but had to take the stairs one step at a time, putting both feet on the same step before going to the next one. Every time she picked up her right leg to move it to the next step, her knee went "out of joint" and she had to painfully "shimmy" it around to get it back into joint before she could put weight on it. Plaintiff testified that she had told her doctors that her knees are unstable, but that Dr. Farley had told her that she was too young to be a good candidate for knee surgery and replacement, and more recently Dr. Caldwell told her that she was not a good risk for the surgery due to her weight and age. Id. at 204-06.

Plaintiff testified that the arthritis in her lower back prevented her from standing for more than five to ten minutes at a time, at which point she would have to sit or lie down "to recuperate [her] back." Plaintiff stated that the arthritis in her right shoulder was not "a big issue." She believed that her knees and back were affected by her weight, and that they also prevented her from exercising. She testified that the arthritis in her

13

hands was more of an aggravation than a major issue, but that she did have some issues with grasping, and that the arthritis in her hips had just begun, and was not major. Plaintiff stated that she has high blood pressure which seemed to be controlled by medication. The ALJ asked Plaintiff if she had any other problems that she felt prevented her from working, and Plaintiff replied no, just her back and knees. Id. at 206-07.

Plaintiff testified that she could lift approximately 40 to 50 pounds using both hands; however she could not do so frequently becasue she could not walk while carrying things. The ALJ asked if she could carry a gallon of milk in both hands and walk. Plaintiff responded that she could not, because she needed to have her hands available to use her cane and to lean on things. Plaintiff testified that she always used the cane when she left her house, but that when she was at home, she did not need the cane because she could lean on doors, walls, chairs, and furniture. Plaintiff explained that although no doctor had prescribed the cane she used, her doctors had indicated that the only reason to prescribe one would be so that insurance would pay for it. Id. at 207-08.

Plaintiff then testified that over the course of an eight-hour day she could sit in a comfortable chair for the full eight hours, and could stand or walk for more than two hours, and only in five-minute intervals with down time in between. The ALJ asked Plaintiff if she would be able to perform a job with a sit/stand option and a fifteen-minute break every two hours. Plaintiff responded that she could probably perform this sort of daily routine, but that she has trouble getting up and down and that doing so was painful

for her.  She mentioned that when teaching, one is expected to get up and down, not sit the whole time.  Id. at 209.

Plaintiff testified that she was capable of pushing and pulling weights with her arms, and of operating the foot controls in a vehicle, though she needed assistance getting in and out of the vehicle.  She had not been able to squat for years, could stoop (standing and bending at the waist) only infrequently and with the help of a cane or other object to lean on, and had no trouble reaching or handling things.  Id. at 209-10.

In response to questioning by her counsel, Plaintiff stated that she had to lie down after she took a shower; that she could not stand in the shower long enough to soap herself, rinse off, and wash her hair, so she would sit and soap herself first; and that she had difficulty getting in and out of the tub.  Plaintiff testified that ordinarily while showering she could stand for a maximum of approximately five minutes, and then would have to sit and rest her back for 15 to 20 minutes.  It took her about ten minutes to change her bed and afterwards she had to lie down; she could not do dishes, even when sitting on a stool, because it required her to lean forward over the sink; and when cooking she sat on a stool and could generally cook for 15 to 20 minutes before she had to lie down to rest.  Id. at 211-12.

Plaintiff testified that when teaching the evening classes, she could not walk around the schools' campuses and that the schools made accommodations for her, such as giving her the classroom nearest to the entrances.  At one of the schools, where the students went to church in a different building less than a block away, another teacher

would take them.  Plaintiff stated that she would not be able to perform this job for six hours a day because that would require her to be on her feet for "longer periods of time." She added that after teaching the one or one-and-a-half-hour evening classes, she was exhausted when she got home and had to lie down for about half-an-hour, and that at these part-time jobs, people helped her carry things to and from her car.  Id. at 212-13.

Counsel asked Plaintiff how her testimony that she could not teach for six hours a day "meshe[d]" with her earlier testimony that she could work full-time at a job requiring sitting for two-hour intervals with 15-minute breaks in between.  Plaintiff responded that if she could sit in a comfortable chair and did not have to get up and down, she could work a full-time job, but she did not know what job would accommodate her by assisting her from the car and carrying her things for her.  Id. at 213.

Plaintiff testified that the maximum distance she could walk was half a block.  She recounted how a year and a half earlier, while her husband was in the hospital, she would park in handicapped parking at the hospital and walk into the lobby.  This was less than a five-minute walk.  In the lobby she would have to sit and rest for five to ten minutes before continuing on to the elevator.  After standing to wait for the elevator and after riding in it, she would immediately go to the sitting room near the elevator to sit and rest. Id. at 213-14.

The ALJ turned to examination of the VE, who noted that the record indicated that Plaintiff had worked at an additional job which Plaintiff had not mentioned at the hearing – in retail sales.  Plaintiff stated that this job was at a ladies clothing store, and she held

16

the job for about four years 15 to 20 years ago, first on a part-time and then on a full-time basis. Her duties included cashiering, being constantly on her feet, moving and unpacking boxes, and moving displays. The VE then asked Plaintiff about another job the record showed she had had, as a day-care teacher. Plaintiff stated that she had worked as a day-care teacher for "a couple of years," but that it was really difficult because she was expected to stay on her feet and was not allowed to sit down. Id. at 215-16.

The ALJ asked Plaintiff if she could think of any other jobs she had held within the past 15 years. Plaintiff responded that she was a teacher's aide for one year at a school, starting out in the pre-school room but then switching to a different class because she could not get down on the floor with the preschoolers and could not take them to the bathroom because there were steps. Id. at 216.

The ALJ then posed two hypotheticals to the VE. First, the ALJ asked the VE to consider a claimant who was 56 years old at the alleged onset date and had 16 years of education who could lift and carry up to 20 pounds occasionally, and ten pounds frequently; could sit for six out of eight hours; could stand or walk for six out of eight hours; could occasionally climb stairs and ramps, but never ropes, ladders and scaffolds; and could occasionally balance, stoop, crouch, and kneel. The ALJ asked if the hypothetical claimant could return to any of Plaintiff's past work. The VE responded that the hypothetical claimant could perform the jobs of teacher's aide, cashier, retail salesperson, and teacher. Id. at 216-17.

17

The ALJ asked the VE to consider a hypothetical claimant who could lift and carry 20 pounds occasionally, and less than 10 pounds frequently; could stand or walk at least two hours but required a handheld device to walk; could sit for about six hours; had to periodically alternate between sitting and standing to relieve pain and/or discomfort; could occasionally climb stairs and ramps, but never ropes, ladders, or scaffolds; and could occasionally balance or stoop, but never kneel, crouch or crawl. The VE responded that such a person could only return to being a cashier at a sedentary level and that such jobs existed in significant numbers locally and nationally. <u>Id.</u> at 218.

Plaintiff's counsel asked the VE to consider the ALJ's second hypothetical, but to add the restriction that the claimant required breaks to lie down for at least 15 minutes approximately every hour. The VE responded that such an individual could not be a cashier. <u>Id.</u> at 218.

### ALJ's Decision of October 25, 2006

The ALJ found that Plaintiff suffered from obesity, degenerative disease of the knees, degenerative disease of the lumbar spine, scoliosis, and hypertension. He found that Plaintiff had a severe combination of impairments and proceeded to consider whether any of them alone or in combination met or medically equaled any impairment found in the Commissioner's listing of deemed-disabling impairments. Noting that obesity was not a listed impairment, the ALJ stated that Plaintiff's obesity did not, by itself or in combination with her other impairments, medically equal any listing. The ALJ also

found that Plaintiff's other impairments did not meet or medically equal a listing.  Id. at
15.

The ALJ next considered whether Plaintiff had the RFC to perform her past work
or other work which existed in the national economy.  The ALJ recognized that if all of
claimant's allegations were fully credible, Plaintiff would not be able to work.  Thus, the
ALJ stated that the crucial inquiry was whether Plaintiff's allegations were credible.  The
ALJ cited Polaski v Hecker, 739 F.2d 1320, 1321-22 (8th Cir. 1984), as setting forth the
factors to consider in assessing the credibility of a disability claimant's subjective
complaints.  Id. at 15-16.

The ALJ found that the objective medical evidence showed that Plaintiff's
hypertension was controlled with treatment and did not result in any end organ damage.
He also found that the objective medical evidence showed degenerative disease of the
knees and back and scoliosis of the spine, but full range of motion of the spine without
muscle spasms, tenderness or any motor, sensory or reflex abnormalities.  He found that
the record showed mild swelling but no tenderness in the right knee; that neither knee
was unstable; that Plaintiff had full strength in all extremities; that Plaintiff used, but did
not "really need," a cane; that Plaintiff had full range of motion in her back; and that the
ranges of motion in her hips and knees were only limited by obesity.  Id. at 16-17.

From this information, the ALJ concluded that the clinical findings were not
consistent with the severe degree of distress and dysfunction alleged by Plaintiff, and that
Plaintiff's symptoms and limitations were not as intense and persistent as alleged.  The

ALJ also determined that Plaintiff's failure to receive physical therapy or treatment in a pain clinic, failure to engage in a home exercise plan, use of only one pain medication supplemented with aspirin, use of a cane which she did not really need, and lack of a brace or crutch were not consistent with the severe symptoms and limitations she alleged. Id. at 17.

In addition, the ALJ stated that after August 2005, Plaintiff had not been seen for treatment of her knees or back, other than for medication refills. The ALJ noted that a lack of regular and sustained treatment was a basis for discounting subjective complaints. The ALJ also considered that there was no medical evidence documenting that Plaintiff had ever been advised to limit her work activities or stop working altogether, and that Plaintiff may have had other possible motivations for filing for disability benefits. The ALJ noted that Plaintiff's husband retired in the same month that Plaintiff filed for benefits (May 2005) and that the school where Plaintiff worked had closed. The ALJ also pointed out that while Plaintiff alleged a disability onset date of June 1, 2003, in both 2003 and 2004 Plaintiff made as much or more than she usually earned. The ALJ found that Plaintiff's failure to disclose in her initial testimony that she had worked in a retail setting, waiting instead for that information to be brought to light by the VE, did "not reflect favorably on her credibility." Id. at 17.

The ALJ repeated that no medical report from any acceptable medical source stated that Plaintiff could not work or that she was disabled, and noted for a second time that a record which contained no physician opinion of disability detracted from a

claimant's subjective complaints. The ALJ stated that the only expert opinion in the record addressing Plaintiff's ability to engage in work-related activities was the report of the state agency medical consultant, Dr. Tayob, and that based on all of the above and Dr. Tayob's description of Plaintiff's physical limitations, Plaintiff could not engage in strenuous or heavy work, or climb ladders or scaffolding; but that she could lift and carry 10 pounds frequently, and 20 pounds occasionally; stand and walk for six out of eight work hours; sit for six out of eight work hours; occasionally use stairs and ramps; and occasionally crouch, stoop, kneel and crawl. The ALJ concluded, based on the VE's testimony and Plaintiff's RFC, that Plaintiff could perform her past relevant work as a teacher, teacher's aide, cashier and retail salesperson, and that Plaintiff "did not sustain her burden of proving that she cannot perform her past relevant work." Id. at 17-19.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; [the court must] also take into account whatever in the record fairly detracts from that decision.'"

Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, disability benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, defined in 20 C.F.R. § 404.1520(c) as a condition of which significantly limits a claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, the disability claim is denied. If the impairment is severe, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix 1.

If the claimant's impairment meets or equals a listed impairment, the claimant is conclusively presumed to be disabled. If the impairment is one that does not meet or equal a listed impairment, the Commissioner asks at step four whether the claimant has

the RFC to perform her past relevant work. Past relevant work is defined as work the claimant did "within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. § 404.1560(b)(1). If the claimant is able to perform her past relevant work, she is not disabled. If she cannot perform her past relevant work, step five asks whether the claimant has the RFC to perform other work in the national economy in view of her vocational factors, i.e., age, education, and work experience. If not, the claimant is declared disabled and is entitled to disability benefits. 20 C.F.R. §§ 404.1520(a)-(g); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

At step five, the burden is upon the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and with her vocational factors. Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). Where a claimant cannot perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Guidelines due to nonexertional impairments, such as pain, the ALJ cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony of a VE. Id.

Here, the ALJ concluded at step three that Plaintiff did not have an impairment that met or equaled a listed impairment. The ALJ then concluded at step four that Plaintiff was able to perform her past relevant work as a teacher, teacher's aide, cashier, or retail sales person. The ALJ determined that Plaintiff had not satisfied her burden of

proving that she could not perform her past relevant work, and therefore did not continue his analysis to step five.

## ALJ's Determination that Plaintiff Could Perform Her Past Work

Plaintiff argues that the ALJ improperly determined that Plaintiff could return to her past work, without first determining the physical and mental demands of those jobs as required by Social Security Ruling ("SSR") 82-62.  SSR 82-62 states that "[p]ast work experience must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work."  1982 WL 31386.  It further states that "[t]he decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision."  Id.  Similarly, the Eighth Circuit requires an ALJ, at step four, to "make explicit findings regarding the actual physical and mental demands of the claimant's past work."  Groeper v. Sullivan, 932 F.2d 1234, 1239 (8th Cir. 1991).

A failure to do so, however, does not require remand where the record contains substantial evidence that the claimant can do her past work.  Riley v. Apfel, 198 F.3d 251, 251 (8th Cir. 1999); Battles v. Sullivan, 902 F.2d 657, 659 (8th Cir. 1990).  Further, an ALJ may rely on the testimony of a VE at step four to determine if a claimant is capable of performing her past work.  Wagner v. Astrue, 499 F.3d 842, 853-54 (8th Cir. 2007).  Thus, although Plaintiff does not specifically challenge the ALJ's RFC determination, this Court will examine whether the RFC determination is supported by

the record.  If so, the ALJ's failure to make explicit findings as to the demands of Plaintiff's past work would not require reversal.

A disability claimant's RFC is the most she can still do despite her limitations.  20 C.F.R. § 404.1545(a)(1).  In <u>McCoy v. Schweiker</u>, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  <u>Id.</u> at 1147.  The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000)).

Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility with respect to the severity of her limitations.  <u>Pearsall</u>, 274 F.3d at 1218.  In <u>Polaski</u>, 739 F.2d at 1332, the Eighth Circuit held that the "absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints."  The ALJ must also consider "observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the frequency, duration, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions." <u>Id.</u>

"If the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to [his] judgment even if every factor is not discussed in depth." Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). "A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question." Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006); see also Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007).

Here, the ALJ offered a number of valid reasons to discount Plaintiff's subjective complaints of disabling impairments: Plaintiff's lack of regular and sustained treatment after August 2005, see Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997); Plaintiff's earnings in 2003 and 2004, despite her alleged June 2003 disability onset date, see Curran-Kicksey v. Barnhart, 315 F.3d 964, 969 (8th Cir. 2003) (stating that a claimant's participation in part-time work was an appropriate matter for the ALJ to consider under Polaski); Meares v. Barnhart, No. 02-CV-0085 (CAS/DDN), 2003 WL 22283913, at *9 (E.D. Mo. Aug. 29, 2003) (Magistrate's Rep. & Recommendation, adopted by Order dated Aug. 18, 2003); the lack of medical evidence documenting that Plaintiff was ever medically advised to limit her work activities, see Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993); and the circumstantial evidence of Plaintiff's possible motivation other than disability in seeking benefits, including that the school she worked at closed and her husband retired contemporaneously with her application for benefits, see Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001) (noting that ALJ's finding that the plaintiff

was not fully credible was supported by the fact that the plaintiff did not lose his job because of his disability, but because his position was eliminated).

Others of the ALJ's rationales for discounting Plaintiff's subjective complaints are less availing, such as Plaintiff's use of a cane despite medical testimony that she did not need it (because the cane was prescribed for support prior to the ALJ's decision); and Plaintiff's use of pain-relieving measures inconsistent with the severe symptoms and limitations she alleged (because Plaintiff's steroid injections belie the ALJ's conclusion that she only used one prescription pain reliever supplemented with aspirin). Nevertheless, on balance, the ALJ's reasons are supported by the record, and this Court will accordingly defer to the ALJ's judgment regarding Plaintiff's credibility.  See, e.g., Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007).

In examining the record for medical evidence of Plaintiff's capacity, the ALJ noted that the only expert opinion addressing Plaintiff's ability to engage in work related-activities came from Dr. Tayob.  The medical record supports Dr. Tayob's findings and the commensurate RFC.  Specifically, Dr. Tayob noted that Plaintiff could stand and/or walk with normal breaks for about six hours in an eight hour workday, and the record indicates that Plaintiff told Dr. Mallard at her June 9, 2004 visit that she was going on a trip "that will require a lot of walking."  Although on August 26, 2005, Dr. Caldwell prescribed a cane for support, he did not restrict Plaintiff's activities.  There is nothing in the record to contradict Dr. Tayob's opinion that Plaintiff could lift and/or carry ten pounds frequently and 20 pounds occasionally.

More weight is generally given to the opinion of an examining source than to the opinion of a non-examining source. 20 C.F.R. § 404.1527(d)(1). In this case, however, there was no examining source who opined as to Plaintiff's abilities to perform work-related activities. Therefore, it was within the ALJ's authority to rely on the RFC provided by Dr. Tayob. See Melton v. Barnhart, No. Civ. 4-03-CV-10053, 2003 WL 21976088, at *4 (S.D. Iowa Aug. 4, 2003) (citing SSR 96-6p, 1996 WL 374180 (explaining that findings of fact and opinions made by non-examining agency physicians must be treated as "expert opinion evidence of non-examining sources," and evaluated in conjunction with other medical evidence of record)); 20 C.F.R. § 404.1527(f)(2)(i) (stating that because state agency medical consultants and other program physicians are highly qualified physicians who are also experts in Social Security disability evaluation, ALJs should consider their findings as opinion evidence); Meares, 2003 WL 22283913, at *11. The fact that most of Dr. Tayob's RFC assessment was almost entirely recorded on a check-box form does not justify discounting it. See Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005).

In sum, the Court concludes that the ALJ's RFC determination is adequately supported by the record. The Court notes, also, that even if the Plaintiff's RFC were more restrictive, the VE identified a past job that Plaintiff could still perform, that of cashiering at a sedentary level.

**ALJ's Findings with Regard to Plaintiff's Obesity**

Plaintiff argues that although the ALJ found that Plaintiff's obesity was a severe impairment, he failed to comply with SSR 02-01p by not considering the impact of Plaintiff's obesity on her RFC. Although the listings of deemed-disabling impairments no longer contain an entry for obesity, the Commissioner still requires that an ALJ give some consideration to a claimant's obesity:

> *Effects of obesity.* Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R. § 404, subpt. P, App. 1 § 1.00(Q). Further, the Commissioner has directed that:

> The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.
>
> * * *
>
> When we identify obesity as a medically determinable impairment . . . we will consider any functional limitations resulting from the obesity in the RFC assessment, in addition to any limitations

> resulting from any other physical or mental impairments that we
> identify.

SSR 02-01p.

Here, a review of the ALJ's decision reveals that he did not fully follow the requirements set out in SSR 02-01p in that he did not specifically refer to Plaintiff's obesity in his RFC assessment. The ALJ determined that Plaintiff's obesity did not by itself, or in combination with her other impairments, medically equal any listed impairment. The ALJ then considered the medical evidence and noted that Plaintiff's obesity was the only limitation on the range of motion in her hips and knees. Also, the ALJ incorporated Dr. Tayob's finding that due to obesity, Plaintiff was not to climb ladders or scaffolding, into Plaintiff's RFC. Plaintiff does not suggest how the ALJ should have further taken her obesity into account or how the hypotheticals propounded to the VE would have changed if the ALJ had done so. Accordingly, the Court concludes that the ALJ did not commit reversible error on this matter. See Robson v. Astrue, 526 F.3d 389, 393 (8th Cir. 2008) (affirming denial of benefits where ALJ did not consider the claimant's obesity in assessing the RFC, because although claimant "claimed that her obesity exacerbated her existing medical infirmities, . . . she [did] not explain how including her obesity would change the question to the VE").

Further, although Plaintiff claimed obesity as a debilitating condition, and testified at the hearing that Dr. Caldwell had told her that she was not a good candidate for knee replacement due to her age and weight, nothing in the medical records states that Plaintiff

had any limitation attributable to obesity, other than Dr. Mendoza's comment that the range of motion in Plaintiffs hips and knees was limited thereby.  In such cases, this Court has affirmed an ALJ's determination that a claimant was not disabled.  <u>See</u> <u>Crowley v. Astrue</u>, No. 08-CV-1686 (HEA/FRB), 2008 WL 596241, at *13 (E.D. Mo. Mar. 4, 2008).

**<u>Third-Party Statements</u>**

Plaintiff argues that the ALJ ignored the testimony of Plaintiff's husband regarding how her symptoms affected her.  As the Commissioner points out, Plaintiff's husband did not testify at the administrative hearing.  And, like the Commissioner, this Court is unable to find any statements by Plaintiff's husband in the record.

**<u>The Unsigned Report of Dr. Tayob</u>**

Plaintiff argues that the ALJ erroneously relied on Dr. Tayob's report because it was unsigned.  The Commissioner counters that while Plaintiff is correct that all consultative examination reports must be signed by the "medical source who actually performed the examination,"  20 C.F.R. § 404.1519n(e), Dr. Tayob's report is that of a non-examining medical consultant.  As the Commissioner argues, there is no specific signature requirement for the reports of non-examining medical consultants.  In any event, there is no suggestion that the report in question was not that of Dr. Tayob.

**ALJ's Reliance on Opinion of a Non-Examining Physician**

Finally, Plaintiff argues that the ALJ erred by relying on the opinion of Dr. Tayob[5] because it was not based on a review of the entire record in the case, which was supplemented after Dr. Tayob's report. As Respondent points out, however, Plaintiff does not explain how this subsequent evidence (which consisted of Dr. Caldwell's August 26 and 30, 2005 medical notes and Dr. Levy's July 24, 2006 report) would have affected Dr. Tayob's decision. Further, the ALJ made explicit reference to Dr. Levy's report and found that there were no opinions in the record contrary to those of Dr. Tayob. The Court's review of the record confirms this finding. As noted earlier, the Court does not believe that Dr. Caldwell's prescription for a cane for support significantly impacts Dr. Tayob's assessment of Plaintiff's ability to stand and walk. In sum, the Court concludes that the ALJ gave proper weight to the report of Dr. Tayob, which was not contradicted by the limited medical evidence submitted thereafter.

## CONCLUSION

The ALJ's decision in this case is supported by substantial evidence in the record. Plaintiff's arguments for reversal are without merit.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

---

[5] Plaintiff does not name Dr. Tayob as the non-examining consultant involved, but his is the only non-examining consultant's report in the record.

A separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 17th day of September, 2008.